Record No.  14-1442

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

RENEE PRYOR,

Appellant,

v.

UNITED AIRLINES, INC.,

Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
————————————————————————

**APPELLEE'S BRIEF**
————————————————————————

Paul E. Bateman
Jody A. Boquist
Angela I. Rochester
LITTLER MENDELSON, P.C.
321 North Clark Street
Chicago, IL 60654
(312) 372-5520

ATTORNEYS FOR APPELLEE UNITED AIRLINES, INC.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................1

STATEMENT OF JURISDICTION.................................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................3

I.     STATEMENT OF THE CASE ..............................................................4

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS .................5

     A.     Pryor's Employment With United ..............................................5

     B.     United's Policies and Prohibition of Harassment.....................6

     C.     Alleged Incidents of Harassment Cited by Pryor ....................8

           1.     The Prostitution Rumors........................................8

           2.     The Bulletin Board Posting ....................................9

           3.     The January 8, 2011 Incident ........................................9

           4.     The October 21, 2011 Incident Over Nine Months Later ....................................................................10

     D.     United's Prompt Investigations and Remedial Actions...........10

           1.     United's Director Of Inflight Reasonably Investigated The Prostitution Ring Rumors .................10

           2.     United's Manager Of Inflight Base Operations Promptly Investigated The Bulletin Board Postings .....11

           3.     United Promptly Investigated The January 2011 Incident ........................................................................12

           4.     United Promptly Investigated the October Incident......16

III.    SUMMARY OF THE ARGUMENT................................................20

IV.    Argument.........................................................................................21

i

# TABLE OF CONTENTS
(CONTINUED)

PAGE

A.  Standard of Review ................................................................21

B.  The District Court Applied the Appropriate Legal
    Framework .............................................................................22

    1.  Pryor Did Not Allege Conduct Sufficiently Severe
    Or Pervasive To Be Recognizable Under Title VII
    or Section 1981 As A Matter Of Law ...........................23

        a.  The Prostitution Ring Rumors ...........................23

        b.  The January & October 2011 Incidents ..............24

C.  The District Court Correctly Held There Was No
    Genuine Issue Of Material Fact Sufficient To Impute
    Liability To United .................................................................26

    1.  United's Remedial Measures Were Calculated To,
    And Did In Fact, End The Harassment .........................27

        a.  The January 2011 Incident .................................27

        b.  The October 2011 Incident .................................33

    2.  Pryor Mischaracterizes the Facts Regarding
    United's Response To The January 2011 Incident ........36

    3.  Pryor's "Notice of Generalized Harassment"
    Arguments Should Be Deemed Waived ........................40

    4.  The Incidents Were Isolated And Were Not
    Sufficient To Place United On Notice Of
    Generalized Harassment ...............................................41

        a.  The Prostitution Rumors ....................................42

        b.  The 2010 Bulletin Board Postings and
    January & October 2011 Incidents.....................42

    5.  Pryor's Attempts To Second-Guesses United's
    Business Judgment Should Be Disregarded .................46

## TABLE OF CONTENTS
(CONTINUED)

**PAGE**

V.   CONCLUSION ...................................................................47

REQUEST FOR ORAL ARGUMENT .................................................49

CERTIFICATE OF COMPLIANCE.................................................47

CERTIFICATE OF SERVICE ..........................................................48

CASES

*Alford v. Martin & Gass, Inc.,*
  391 Fed. Appx. 296, 298 (4th Cir. 2010)......................................27, 28

*Amirmokri v. Baltimore Gas and Electric Co.,*
  60 F.3d 1126 (4th Cir. 1995) ...............................................................42

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...............................................................................20

*Baldwin v. Blue Cross/Blue Shield,*
  480 F.3d 1287 (11th Cir. 2007) .....................................................44, 33

*Bass v. E.I. DuPont de Nemours & Co.,*
  324 F.3d 761 (4th Cir. 2003) ...............................................................20

*Burlington Indus. v. Ellerth,*
  524 U.S. 742 (1998)...............................................................................24

*Causey v. Balog,*
  162 F.3d 795 (4th Cir. 1998) ...............................................................19

*Covenant Media of South Carolina, LLC v. City of North Charleston,*
  493 F.3d 421 (4th Cir. 2007) .........................................................19, 33

*Crockett v. Mission Hosp., Inc.,*
  717 F.3d 348 (4th Cir. 2013) ...............................................................26

*Dunn v. Washington County.,*
  429 F.3d 689 (7th Cir. 2005) ...............................................................42

*EEOC v. Central Wholesalers, Inc.,*
  573 F.3d 167 (4th Cir. 2009) .................................................25, 32, 39

*EEOC v. R & R Ventures,*
  244 F.3d 334 (4th Cir. 2001) ...............................................................21

*EEOC v. Sunbelt Rentals, Inc.,*
  521 F.3d 306 (4th Cir. 2008) .................................................20, 21, 25

*EEOC v. Xerxes,*
  639 F.3d 658 (4th Cir. 2011) .........................................27, 29, 30, 33

iv

# TABLE OF AUTHORITIES
## CONT'D.

**PAGE**

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998)................................................................24

*Francis v. Booz, Allen & Hamilton, Inc.,*
    452 F.3d 299 (4th Cir. 2006) ............................................20

*Freeman v. Dal-Tile Corp.,*
    750 F.3d 413 (4th Cir. 2014) ...........................................40

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993)..................................................21, 23, 22

*Helvering v. Gowran,*
    302 U.S. 238 (1937)...............................................................33

*Honor v. Booz-Allen & Hamilton, Inc.,*
    383 F.3d 180 (4th Cir. 2004) ...........................................19

*Johnson et al. v. United Airlines,*
    2013 U.S. Dist. LEXIS 110640 - 14 (E.D. Va. August 2, 2013) ...............39, 40

*Knabe v. Boury Corp.,*
    114 F.3d 407 (3rd Cir. 1997) ...........................................31

*Meritor Sav. Bank, FSB v. Vinson,*
    477 U.S. 57 (1986)................................................................24

*Mikels v. City of Durham,*
    183 F.3d 323 (4th Cir. 1998) ...............................31, 42, 41

*Okoli v. City of Baltimore,*
    648 F.3d 216 ...........................................................................22

*Olson v. Lowe's Home Ctrs. Inc.,*
    130 F. App'x 380 (11th Cir. 2005)...................................26

*Othentec Ltd. v. Phelan,*
    526 F.3d 135 (4th Cir. 2008) ......................................20, 38

*Roberts v. Fairfax County Public Schools,*
    858 F. Supp. 2d 605 (E.D. Va. February 6, 2012)............23

# TABLE OF AUTHORITIES
## CONT'D.

**PAGE**

*Silver v. GMC,*
  2000 U.S. App. LEXIS 17752 (4th Cir. 2000)....................................32

*Singleton v. Wulff,*
  428 U.S. 106 (1976)...........................................................................37

*Spicer v. Com. of Va. Dep't of Corrections,*
  66 F.3d 705 (4th Cir. 1995) .......................................................20, 28

*Spriggs v. Diamond Auto Glass,*
  242 F.3d 179 (4th Cir. 2001) ............................................................32

*United States v. Carter,*
  139 F.3d 424 (4th Cir. 1998) ............................................................33

*Watson v. Blue Circle, Inc.,*
  324 F.3d 1252 (11th Cir. 2003) ........................................................42

*Wheatley v. Wicomico Cnty., Maryland,*
  390 F.3d 328 (4th Cir. 2004) ............................................................37

**STATUTES**

42 U.S.C. § 1981 .........................................................................2, 5, 21

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*..............passim

**OTHER AUTHORITIES**

F.R.C.P. 30(b)(6)....................................................................................33

F.R.E. 803(6).........................................................................................35

Federal Rule of Appellate Procedure 32(a)(7)(B) ............................47, 46

Local Rule 34(a)....................................................................................46

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, Appellant United Airlines, Inc., ("United") by and through its undersigned counsel, states that is a wholly-owned subsidiary of United Continental Holdings, Inc. (a Delaware Corporation), which is a publicly held company.  To United's knowledge, no other publicly-held company beneficially owns 10 percent or more of the outstanding common stock.

1

## STATEMENT OF JURISDICTION

The United States District Court for the Eastern District of Virginia had subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f)(3) and 42 U.S.C. § 1981.  The action presents federal questions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended, and 42 U.S.C. § 1981.

By order dated April 16, 2014, the district court granted United's Motion for Summary Judgment, and entered judgment in favor of United on that same day. Pryor filed a timely Notice of Appeal on May 2, 2014.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred in finding that Pryor met her burden of establishing a genuine issue of material fact  that she experienced racial harassment sufficiently severe or pervasive to alter the conditions of her employment.

Whether the District Court correctly held as a matter of law that   there is no basis to impose liability on United for alleged harassment toward Pryor.

## I.    STATEMENT OF THE CASE

In her Amended Complaint, Appellant Renee Pryor ("Pryor") alleged that she was subject to actionable racial harassment under Title VII and § 1981, respectively, based upon two incidents:  (1) she was twice subjected to questions over the span of more than a decade about her knowledge of an alleged prostitution ring involving African-American United flight attendants who flew to Kuwait; and (2) in 2011, she was the recipient of two anonymous racist "hunting licenses" claiming open season on all "n_____s," one of which bore a drawing of a noose, in her United mailbox.  For the first time, during summary judgment proceedings, Pryor also alleged that she heard about a United bulletin board posting, seeking a roommate, that contained racial epithets.

United moved for summary judgment on March 20, 2014.  As detailed in United's summary judgment briefing, United management took immediate steps to investigate the deplorable anonymous notes left in Ms. Pryor's mailbox, as well as the anonymous bulletin board posting and prostitution rumors.  After extensive briefing and hearing oral argument, the District Court issued a detailed 29-page Memorandum Opinion which granted United's Motion for Summary Judgment, in its entirety, on April 16, 2014.  In its Memorandum Opinion, the District Court held that there was no genuine issue of material fact regarding the prostitution rumors and the bulletin board postings, and that those incidents did not rise to the

level of actionable harassment as a matter of law. (JA 2259 – 2270.) The District Court further held that while there was an issue of material fact as to whether the two offensive notes left in Pryor's mailbox were sufficiently severe to rise to the level of actionable conduct, there was no basis for imputing liability to United for the anonymous notes. (JA 2266 - 2269.) Specifically, the District Court correctly found that United management took the January 2011 and October 2011 notes seriously, and promptly involved United's Corporate Security, interviewed Pryor, and monitored the mailboxes. (JA 2267 - 2269.) Thus, the District Court held that the undisputed material facts demonstrated United's investigation stemming from the January 2011 and October 2011 incidents was "diligent" and reasonably calculated to stop the offending conduct. (JA 2267 - 2271.) Therefore, the conduct of anonymous individuals could not be imputed to United under the Title VII or 42 U.S.C. §1981.

This Court should affirm the District Court's thorough and well-reasoned decision to grant summary judgment to United.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Pryor's Employment With United

Plaintiff started working at United in 1984 as a Flight Attendant. (JA 1079.) During the relevant time period, Pryor was a Flight Attendant based at Dulles Airport, in Virginia. (JA 1080 – 1081.) Pryor is currently based at Houston,

Texas.  (JA 1082.)   During the relevant time period, Pryor's direct supervisor, Ritchie Reyes ("Reyes"), was also based in Dulles.  (JA 1116, 2042.)   Denise Robinson-Palmer ("Robinson-Palmer"), was the Manager, Inflight Base Operations at Dulles.  (JA 2011.)   Mary Kay Panos ("Panos") was United's Director of Inflight at the Dulles Base.  (JA 1230.)

### B.    United's Policies and Prohibition of Harassment

At all relevant times, United maintained a strict policy prohibiting all forms of discrimination and harassment in the workplace.  (JA 1083 – 1086, 1191, 1220 – 1222, 1244 – 1246, 1271 – 1272,  1281, 1323, 1529 – 1531, 1539 – 1540, 1546 – 1547, 1555 – 1563, 1620 - 1860.)   United's policies and procedures with respect to discrimination and harassment were also available on United's intranet (known as "Skynet"), and posted throughout the Dulles base.  (JA 1368 – 1374, 1220 – 1222, 1244 – 1246, 1085.)   All employees were advised and encouraged to read them. (Id.)   Pryor admits that she accessed Skynet regularly, was aware of and read certain company policies, but did not read the policy against discrimination and harassment.  (JA 1083 – 1086, 1191.)

On Skynet, United provided its employees with its Working Together Guidelines ("WTG"), which is currently United's policies and procedures, including its policy on discrimination, harassment and retaliation.  (JA 1083 – 1086, 1191, 1220 – 1222, 1271 – 1272, 1281, 1244 – 1246, 1323, 1504 – 1505,

1529 – 1531, 1706 – 1717, 1723 – 1728, 1744 - 1746.)[1]    If an employee was subjected to discrimination, harassment or retaliation, employees were directed to contact: (1) their supervisor or any member of management; (2) Human Resources; (3) the Ethics and Compliance Hotline (where the employee may leave an anonymous message) or (4) United's Employee Service Center ("ESC") hotline (where the complaint would be escalated to United's Human Resources department).  (JA 1220 – 1222, 1385 – 1388, 1368 – 1374, 1281 – 1282, 1239 – 1240, 1243, 1324 – 1325, 1529 – 1531, 1539 – 1541, 1627, 1638 – 1639, 1657, 1723, 1744 - 1746.)

Pryor understood that in the event she was subjected to inappropriate or offensive workplace behavior, she could contact her supervisor or contact the ESC. (JA 1086 – 1116, 1125 – 1126, 1131 – 1132, 1137 – 1139, 1191.)  Further, United informed Pryor of its policies against harassment, discrimination and retaliation by providing her access to the policies on Skynet at all times, and a copy of the WTG in her company mailbox.  (JA 1086, 1191, 1271 - 1272.)

Despite Pryor's assertion to the contrary, the District Court correctly found that the undisputed record facts confirm that in 2011, there were multiple paths available to escalate and investigate if local management at Dulles received a

---

[1] Before October, 2010, when Continental and United merged, United's policy was known as the Harassment and Discrimination (H&D) policy.  (JA 1220 – 1222, 1504 – 1505, 1529 – 1531, 1706 – 1717.)  That policy was subsumed into United's Working Together Guidelines some time during the first or second quarter of 2011.  (*Id.*)

workplace complaint (particularly if it involved threats).  (JA 1542 - 1545.)  One available option, pursuant to United's written Harassment and Discrimination policy, was for local management to contact the ESC.  (JA 1542 – 1545, 1560.)  However, another alternative avenue for workplace complaints was to contact United's Corporate Security department. (JA 1542 – 1545.)

### C.    Alleged Incidents of Harassment Cited by Pryor

#### 1.    The Prostitution Rumors

Pryor was asked about her knowledge of rumors circulating about United Flight Attendants, allegedly moonlighting as prostitutes in Kuwait, on two occasions over the span of more than 10 years.  (JA 0017, 1077 – 1078, 1088 – 1089, 1100 – 1110, 1185 – 1187.)  In the first incident, Pryor claims that in the mid 1990s, when she was domiciled in San Francisco, California, an unidentified male co-worker asked her if it was true that "all African-American flight attendants that fly to Kuwait are prostitutes."  (JA 1100 – 1110.)  In response to the question, Pryor claims she approached Stephen Stout, a San-Francisco-based supervisor, and told him that "someone just asked [her] about African-American flight attendants being – prostituting in Kuwait."  (JA 1100 – 1110.)  Pryor did not complain or otherwise provide Stout with any information so that he could speak with whomever allegedly asked Pryor about the prostitution rumors.  (JA 1100 – 1110.)

In the second and final incident, Pryor claims that in 2008 or 2009, she was

asked by another unidentified flight attendant whether or not flight attendants who flew trips to Kuwait were prostitutes.  (JA 0017, 1107 – 1110.)  It is *undisputed* that Pryor never reported this second incident to anyone at United. (JA 0017, 1107 - 1110.)   It is also *undisputed* that Pryor had not flown any flights to Kuwait at the time any of these comments were made.  (JA 1109 - 1110.)

### 2.    The Bulletin Board Posting

Pryor testified that at some point while she was domiciled in Dulles, a co-worker told Pryor about a posting purportedly seeking a roommate was placed on a United bulletin board.  (JA 1175 – 1177, 1183 – 1184, 1207 – 1213.)   The document allegedly stated that "no niggers" need apply.  (JA 1175 – 1177, 1183 – 1184, 1207 – 1213.)  It is undisputed that Pryor never saw the posting.  (JA 1183 – 1184.)

### 3.    The January 8, 2011 Incident

On Saturday, January 8, 2011 Pryor checked her United mailbox just before boarding a flight.  (JA 1110 – 1114.)  Her mailbox contained a document bearing an image of a person hanging from a pole or a tree with the handwritten words that it was "open season on all niggers" (the "January 8 Incident").  (JA 0015, 1110 – 1114, 1143 – 1145, 1164 – 1174, 1193, 1196 – 1203.)   Immediately upon discovering the document, Pryor notified supervisor Reyes and gave Reyes the original document she found in her mailbox.  (JA 0015, 1115 – 1120.)

### 4.    The October 21, 2011 Incident Over Nine Months Later

On or about October 21, 2011, over nine  (9) months after the January 8, 2011 incident occurred (and with no other racist documents found) a document purporting to be a hunting license containing racial slurs was placed into Pryor's company mailbox (the "October 21 Incident").  (JA 0016, 1134 – 1164, 1174 – 1179, 1204 – 1216, 1283 - 1284.)  Specifically, the document was fashioned to resemble a license, with the title "Federal Nigger Hunting License" and stated that for a fee, the license holder can "hunt & kill NIGGERS during the open search hereof in the US."  (JA 0016, 1134 – 1164, 1174 – 1179, 1204 – 1216, 1283 - 1284.)  Following a sweep of the other Flight Attendant mailboxes, it was discovered that eight of Pryor's co-workers also received a copy of the document, four of whom actually saw the document.  (JA 1306 – 1310, 1313 – 1317.)

### D.    United's Prompt Investigations and Remedial Actions

### 1.    United's Director Of Inflight Reasonably Investigated The Prostitution Ring Rumors

Panos oversees over 2,500 front-line Flight Attendants at Dulles.  (JA 1241 – 1242.)  Sometime in 2009, Panos heard about the prostitution rumors third-hand from people on her staff, and inquired as to any detail about the rumors and the names of the people allegedly involved so that she could further investigate the truth of the rumors.  (JA 1420 – 1426, 1231 – 1238.)  Aside from identifying a hotel at which the ring was purportedly centered, no one could provide any details

about who was involved or if the rumor was in fact true. (JA 1420 – 1426, 1366 – 1367.) Because the rumors did not include the identification of anyone by name, nor was any information pertaining to the rumors documented, Panos directed one of the supervisors who reported to her at the time to call the General Manager who oversees United's flights out of Kuwait in order to determine the validity of the rumors. (JA 1418 – 1426, 1366 – 1367.) In addition, Panos directed the supervisor to call the general manager of the Kuwait hotel under contract at the time to see if there were any issues or concerns regarding United employees. (JA 1420 – 1426, 1366 – 1367.) Panos understood that the hotel did not identify any issues or concerns regarding United employees. (*Id.*)

## 2. United's Manager Of Inflight Base Operations Promptly Investigated The Bulletin Board Postings

As noted by the District Court, the undisputed facts confirm that Denise Robinson-Palmer ("Robinson-Palmer"), the Manager, Inflight Base Operations at Dulles, took prompt remedial action in response to the two Bulletin Board Postings, which occurred over a short time period in the Fall of 2010. (JA 2265 – 2270.) Immediately after being informed of the bulletin board postings, Robinson-Palmer removed them. (JA 1298 – 1301, 1427 – 1446, 1247 – 1254, 1336 – 1342, 1346 – 1347, 1470 – 1471.) Following removal of the posting, Robinson-Palmer also called the phone number listed on the document to determine who posted the document. (JA 1336 – 1342, 1346 – 1347, 1298 – 1301,

1427 – 1446, 1247 – 1254.)   The woman with whom Robinson-Palmer spoke confirmed that her company did not create such an ad.  (JA 1336 – 1342, 1346 – 1347, 1298 – 1301, 1427 – 1446, 1247 – 1254.)  Robinson-Palmer was so offended by the documents she destroyed them. (JA 1336 -1341.)   United management subsequently monitored the board (and continues to monitor the board).  (JA 1251 – 1253, 1336 -1342.)  No further inappropriate postings on the bulletin board have occurred.  (JA 1427 – 1431.)

### 3.    United Promptly Investigated The January 2011 Incident

Immediately following receipt of the anonymous note found in Pryor's mailbox on Saturday, January 8, 2011, Reyes called Panos and informed her of the document because Reyes wanted to make sure that she was aware of the document so that the company would investigate it.  (JA 1255 – 1256, 1535 – 1536, 1602 – 1610.)  By the end of the week, Panos contacted United's Human Resources and Legal Departments.  (JA 1257 – 1264.)   Upon information and belief, at some point between Monday, January 10 and Wednesday January 12, 2011, Robinson-Palmer met with Pryor.  (JA 1121 – 1124, 1322, 1326 – 1335.)  Robinson-Palmer, who is also African-American, interviewed Pryor and assured Pryor that United's Corporate Security would be informed of the incident.  (JA 1322, 1326 – 1333.)  Pryor advised that she was not aware of who could have left the note.  (JA 1485, 1488.)

On January 11, 2011 Robinson-Palmer also contacted Mike Folan ("Folan") in United's Corporate Security to inform him of the January 8 Incident. (JA 1334, 1361 – 1362, 1542 – 1543, 1565 – 1567, 1864 – 1866, 1881 – 1883.) Folan was unable to identify a suspect or even a time of placement of the document. (JA 1484 – 1490, 1542 – 1545, 1565 – 1567, 1594, 1598 – 1601, 1865 – 1866, 1881 – 1883.) Folan was unable to "brush" for prints as there were no prints of other employees to match them with, and there was no telling how long the item was there, as anyone could have touched it. (JA 1484 – 1490, 1542 – 1545, 1565 – 1567, 1594, 1598 – 1601, 1865 – 1866, 1881 – 1883.) Folan accordingly instructed Robinson-Palmer to take the following actions: (1) address Pryor's supervisors to make them aware of the incident; (2) perform periodic audits of Pryor's mailbox; and (3) to keep him informed. (JA 1352 – 1359, 1361 – 1362, 1864 – 1866, 1881 – 1883.) Robinson-Palmer took those actions. (JA 1352 – 1359, 1361 – 1362, 1864 – 1866, 1881 – 1883.)

On February 4, 2011, Robinson-Palmer and Folan spoke again. (JA 1326 – 1333, 1361 – 1362.) Robinson-Palmer informed Folan that there was nothing new to report; that no further documents were found. (JA 1326 – 1333, 1361 – 1362.) Folan therefore viewed this as an isolated incident. (JA 1484 – 1485, 1501 – 1503, 1565, 1567, 1593 – 1601.) He nevertheless instructed Robinson-Palmer to update her managers and to continue monitoring the mailboxes for anything suspicious.

13

(JA 1326 – 1333, 1361 – 1362, 1501 – 1503, 1565 – 1567, 1593 – 1601.) Thereafter, Panos dispatched a "must read" communication to all the Dulles-based employees informing them, among other things, that inappropriate and offensive material was found in a co-worker's mailbox, that United was in the process of investigating the incident and urging anyone with knowledge or information regarding the incident or similar activities notify a member of management immediately. (JA 1165 – 1166, 1194 – 1195, 1549 – 1551, 1611 – 1619.)

On February 16, 2011, after Pryor's local managers started monitoring mailboxes for any other suspicious activity, Pryor contacted United's ESC. (JA 1125 – 1130, 1179, 1216, 1495 – 1496, 1568 – 1588, 1598 – 1601.) Pryor's complaint was escalated to Alice Zauner ("Zauner"), a Chicago-based Human Resources Manager at United, to investigate. (JA 1389 – 1405, 1408 – 1413, 1451 – 1469, 1474 – 1477, 1495 – 1496, 1514 – 1515, 1568 – 1588, 1598 – 1601.) On February 18, 2011, Pryor spoke with Zauner via telephone. (JA 1125 – 1130, 1390 – 1391, 1505 – 1506, 1593 – 1601.) Zauner attempted to schedule additional calls with Ms. Pryor on multiple dates to obtain information from Ms. Pryor, and when they eventually spoke, she was uncooperative. (JA 1505 – 1506, 1511 – 1513, 1516 – 1518, 1522 – 1523, 1533 – 1534, 1547 – 1548, 1593 – 1601.) During the "difficult" interview, Pryor finally revealed that she had not had any altercations with other United employees and had no idea who may be responsible for the note

14

in her mailbox. (JA 1510, 1513, 1516 – 1519, 1522, 1595, 1599.)[2]    When asked about how she wanted to see the situation resolved, Pryor told Zauner that a general e-mail to United employees might be sufficient. (JA 1125 – 1128, 1517, 1595.)

Despite Pryor's lack of cooperation, Zauner nevertheless attempted to seek information from other sources. (JA 1390 – 1391, 1497 – 1499, 1505 – 1510, 1518 – 1521, 1527 – 1528, 1535 – 1536, 1547 – 1548, 1551 – 1552, 1589 – 1610.) Specifically, during the course of her investigation, Zauner went on to interview Reyes, Alex Barretto (another Dulles-based Manager), and Robinson-Palmer. (*Id.*) Zauner also spoke to Folan about next steps. (JA 1390 – 1391, 1500 – 1503, 1532, 1537 – 1538, 1578, 1582, 1594, 1599 – 1610.) As the document was placed into Pryor's mailbox anonymously and because there were no cameras in the domicile, Zauner likewise could not to identify any witnesses or ascertain a specific time of when the document was placed in Pryor's mailbox. (JA 1174 – 1175, 1204 – 1205.) Zauner was also unable to identify a suspect in connection with the January 8 Incident, or any history of a similar incident. (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527.) As a result, Zauner also concluded that the January 8

---

[2] Zauner (and subsequently, Bellomusto) asked Pryor whether she had any idea as to who may have placed the notes in her mailbox. Pryor stated to both that she did not know. (JA 1175 – 1176, 1210, 1513, 1595.) However, as the District Court noted, the record confirms that Pryor voluntarily provided MWAA police with the names of "two persons of interest" in or around March 2011, both of whom were United employees. (JA 2185, 2188, 2268.)

Incident was an isolated incident.  (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527.)

Zauner subsequently informed Pryor of all of her findings.  (JA 1174 – 1175, 1204 – 1205.)  Zauner advised Pryor that Dulles Supervisors were notified of the incident and instructed to observe and report any similar activity.  (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527, 1549 – 1551, 1598 – 1601, 1611 - 1619.)  Zauner also assured Pryor that United's Corporate Security department was notified of the incident.  (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527, 1549 – 1551, 1598 – 1601, 1611 - 1619.)

Notably, the Metropolitan Washington Airport Authority Police Department ("MWAA") likewise was unable to identify a suspect, and closed their investigation on July 4, 2011.  (JA 2189.)

### 4.    United Promptly Investigated the October Incident

Over nine months after the January 8, 2011 Incident, Pryor received a similar anonymous "hunting license" in her mailbox on October 21, 2011. Pryor claims she approached Sandra Sales ("Sales") (who is also African-American) and at the time a Manager in the Dulles domicile.  (JA 1136 – 1138.)  Pryor speculates that Sales saw the document that Pryor was holding but said and did nothing in response.  (JA 1136 – 1138.)   In actuality, Sales testified that she knew Pryor received a document, but Pryor was upset at the time and waving the document as

she spoke, so Sales was unable to see what was printed on the document. (JA 1273 – 1274.) Pryor then rushed to Reyes to show him the document. (JA 1138 – 1140.) Reyes asked Pryor to give him the document, but Pryor refused to give him a copy of the document, instead telling him that she was going to the police. (JA 1138 – 1140.) Immediately thereafter, Reyes called Panos to inform her of this incident, and Pryor filed a police report with MWAA police department. (JA 1140 – 1142, 1145 – 1148.)

On October 24, 2011, Pryor contacted United's ESC to lodge a complaint about the October 21 Incident. (JA 1131 – 1132, 1175, 1206.) The next day, Bill Brown, a representative in United's ESC acknowledged receipt of Pryor's complaint and informed her that an investigator would be contacting her. (JA 1175, 1206.) Corporate Security contacted Pryor regarding the incident. (JA 1156 – 1158, 1466 – 1469, 1872, 1873, 1876.) United assigned the investigation of the October 21 Incident to Washington's Human Resources Manager, George Bellomusto ("Bellomusto"). (JA 1151, 1279 – 1280, 1286 – 1297, 1302 – 1306, 1313 – 1317, 1374 – 1379, 1481.) Bellomusto conducted numerous interviews of Pryor, Moses, Morgan and Emery, Reyes, Sales, Barretto, Robinson-Palmer and Panos. (*Id*.) Bellomusto coordinated a team that conducted regular periodic inspection of mailboxes. (*Id*.)

Bellomusto and United collaborated with MWAA police to facilitate

17

fingerprinting of various employees, conducted numerous interviews of Pryor and others, and regular periodic inspection of mailboxes. [3]  (JA 1151, 1279 – 1280, 1286 – 1297, 1302 – 1306, 1313 – 1317, 1374 – 1379, 1481, 1872 – 1874.)  United also installed video surveillance of the mailbox area during Bellomusto's investigation.  (JA 1285 – 1289, 1313 – 1317, 1348 – 1351, 1872 – 1874.)  United, however, was unable to identify the individual who placed the documents in the mailboxes. (JA 1151, 1279 – 1280, 1286 – 1297, 1302 – 1306, 1313 – 1317, 1374 – 1379, 1481, 1872 – 1874.)  Since the October 21 Incident, there have been no further incidents of this nature reported. (JA 1481.)

On or about November 15, 2011, Bellomusto prepared a written report and concluded his investigation into the October 21 Incident.  (JA 1177 – 1178, 1214 – 1215, 1306, 1313 - 1317.)   On December 15, 2011, Bellomusto informed Pryor that, among other things, video surveillance had been installed near the mailboxes in order to prevent future occurrences of people placing offensive documents in company mailboxes.  (JA 1177 – 1178, 1214 – 1215.)

In addition, Bellomusto suggested having Pryor's mailbox name changed to an alias.  (JA 1162 – 1163, 1329 – 1330, 1343 – 1345.)  Pryor requested that she report to a different manager.  (JA 1162 – 1163, 1329 – 1330, 1343 – 1345.)

---

[3] The others interviewed included Flight Attendants Maurice Morgan, Pierre Emory, William Whitner, as well as Reyes, Sales, Barretto, Robinson-Palmer and Panos from United management.  (JA 1315 - 1316.)

United granted that request.  (JA 1162 – 1163, 1329 – 1330, 1343 – 1345.)  Since that time, there have been no other instances of offensive racial notes left in Flight Attendants' mailboxes.  (JA 1481.)

## III.   SUMMARY OF THE ARGUMENT

As set forth below, the District Court's thorough, well-reasoned decision granting summary judgment in favor of United should be affirmed.   The District Court correctly found United's investigation into the anonymous rumors and anonymous notes was adequate, and that United's remedial actions were reasonably calculated to end, and did in fact end, the alleged harassment toward Pryor and others.

In an attempt to undermine the District Court's decision, Pryor tries to recast her claim into one based upon United's allegedly being "on notice" of on-going racial harassment within its workforce, and the contention that the prostitution rumors, the bulletin board postings (which were not even referenced in the Amended Complaint), and the 2011mailbox incidents were somehow connected. Pryor should be deemed to have waived this argument as it was not raised in the District Court.  However, even if it is considered, Pryor's argument is based upon nothing more than sheer speculation.  As such, it cannot create a genuine issue of material fact.

Pryor cannot, and does not, argue that United's October 2011 investigation and remedial actions were improper in any way.  Instead, Pryor devotes great effort to second-guessing United's investigations and remedial actions before that time, unpersuasively claiming that United failed to follow its own policies and failed to

20

appropriately handle the "evidence."  The District Court correctly rejected Pryor's argument, because even if United management did not follow written policies to a "T", it is immaterial.  There is no dispute that: (1) all of Pryor's complaints were appropriately escalated; (2) United took practical measures in response to each complaint; and (3) United's investigation was timely, thorough, and caused the offending conduct to cease.  In short, Pryor's argument is nothing more than an improper attempt to second-guess United's business judgment.

In summary, United shares Pryor's intolerance of and opposition to racial harassment and discrimination and has at all times taken such reports seriously. The District Court properly determined that no basis exists for the imposition of liability upon United.  The District Court therefore dismissed Pryor's lawsuit. United respectfully requests that this Court affirm the District Court's grant of summary judgment in favor of United and its Order of Dismissal.

## IV.    ARGUMENT

### A.    Standard of Review

This Court reviews the district court's grant of summary judgment to United *de novo*.  *Covenant Media of South Carolina, LLC v. City of North Charleston*, 493 F.3d 421, 427 (4th Cir. 2007); *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004); *Causey v. Balog*, 162 F.3d 795, 799 (4th Cir. 1998).  The mere existence of a scintilla of evidence in support of the plaintiff's position will

21

be insufficient to defeat the defendant's summary judgment motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. At the summary judgment stage, the nonmoving party must come forward with more than "mere speculation or the building of one inference upon another" to avoid dismissal of the action. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (internal quotation marks and citation omitted); *see also Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.")

### B.    The District Court Applied the Appropriate Legal Framework

In order to prevail on a claim for a racially hostile work environment, a plaintiff must show that the harassment was: (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment; and (4) there was some basis for imposing liability on the employer. *Bass v. E.I. DuPont de Nemours & Co*., 324 F.3d 761, 765 (4th Cir. 2003); *Spicer v. Com. of Va. Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995). Because Pryor seeks to reverse a grant of summary judgment, she has the burden of establishing a material dispute of fact with respect to each of these four requirements. *EEOC v. Sunbelt Rentals,*

*Inc.*, 521 F.3d 306, 310 (4th Cir. 2008) (*citing EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001)).

### 1.    Pryor Did Not Allege Conduct Sufficiently Severe Or Pervasive To Be Recognizable Under Title VII or Section 1981 As A Matter Of Law

In order to be legally cognizable, alleged harassment must assessed in view of the totality of the circumstances, including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or merely offensive; and (4) whether the conduct unreasonably interfered with an employee's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

> Our circuit has likewise recognized that plaintiff must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.

*Sunbelt Rentals*, 521 F.3d at 315.

### a.    The Prostitution Ring Rumors

In its order granting summary judgment to United, the District Court noted that there can be no doubt that the prostitution ring rumors were neither severe or pervasive. (JA 2260.) With regard to the severity element, there is no evidence that Plaintiff was directly accused of participating in the prostitution ring, nor did Pryor allege facts to show that either she or anyone else complained to United management. *Harris*, 510 U.S. 17, 21 (mere utterance "which engenders offensive

23

feelings in an employee" does not satisfy the element.) Additionally, Pryor never alleged that the inquiries caused her to stop working. With regard to pervasiveness, the District Court adopted and applied the correct legal standards in holding that two offensive questions pertaining to Pryor's knowledge of the prostitution rumors over the course of more than 10 years does not rise to the level of actionable harassment as a matter of law. (JA 2260 – 2261; *see also Harris*, 510 U.S. at 21-23. The grant of summary judgment in favor of United as to the prostitution rumors should therefore be affirmed.

### b. The January & October 2011 Incidents

With respect to the notes left in her company mailbox, Pryor alleges two anonymous racist notes left over a nine-month period. (JA 0015 - 0016, 1110 – 1120, 1134 – 1179, 1193, 1196 – 1216, 1283 – 1284.) The District Court found that the January and October 2011 notes were actionable in and of themselves by virtue of the element of violence depicted on the notes. (JA 2262 – 2264.) In so holding, the District Court relied on this Court's decision in *Okoli v. City of Baltimore* finding that the plaintiff presented a strong hostile work environment claim because she was subjected to repeated propositioning and physical touching. 648 F.3d 216, 220 – 221 (4th Cir. 2011). Additionally, the perpetrator was an identified supervisor. (*Id*.) Neither fact is present in this case.

United recognizes that the standard for hostile work environment requires

that the plaintiff establish that the harassing conduct be severe or pervasive, and that the Fourth Circuit has recognized that a single incident may be severe enough to be actionable.  However, at least one court within this Circuit has held that two comments of a similar nature as those alleged by Pryor *did not* rise to the level of severe or pervasive harassment.  *See e.g., Roberts v. Fairfax County Public Schools,* 858 F. Supp. 2d 605, 609-11 (E.D. Va. February 6, 2012) (alleged direct threat to "kill you nigger" coupled with another direct slur using the word "nigger" insufficient to state a claim of harassment).  The *Roberts* court specifically "assumed their veracity" in holding that threats and slurs were not "sufficiently severe or pervasive" to "permeate" the work environment with discriminatory intimidation, ridicule and insult.  *Roberts,* 858 F. Supp. at 611(*citing Harris.,* 510 U.S. at 21 ).  As in *Roberts*, the instant matter involved two incidents involving racial slurs and alleged threats (and unlike *Roberts*, were anonymous). Considering these comments in the totality of the circumstances, which includes the fact that Pryor has not alleged that the receipt of the notes was so severe as to cause her to stop working, and the fact that Pryor remains a United employee to this day (JA1082), this Court should hold that the January and October 2011 incidents were not subjectively severe or pervasive as a matter of law.  United therefore respectfully submits that the District Court's finding that there is a genuine issue of material fact as to the severity of January and October 2011 notes

should be reversed.

### C. The District Court Correctly Held There Was No Genuine Issue Of Material Fact Sufficient To Impute Liability To United

Regardless of whether the January 2011 and October 2011 notes rose to the level of actionable harassment, however, the District Court's grant of summary judgment in favor of United should be affirmed.  The District Court correctly applied Fourth Circuit precedent in holding that Pryor did not establish an issue of material fact whether liability can be imputed to United as a matter of law. Specifically, the District Court correctly emphasized that employers cannot automatically be held liable for acts of harassment in the workplace.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986).  An employer is not liable for a hostile work environment claim if:  (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  "There is no 'exhaustive list' or 'particular combination' of remedial measures or steps that an employer need employ to insulate itself from liability." *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 178 (4th Cir. 2009).  Moreover, in cases involving anonymous harassment, the plaintiff must present sufficient evidence to demonstrate that defendant "knew or should have known about the

harassment and failed to take effective action to stop it . . . [by] responding with remedial action reasonably calculated to end the harassment." *Sunbelt Rentals*, 521 F.3d at 319.

### 1. United's Remedial Measures Were Calculated To, And Did In Fact, End The Harassment

#### a. The January 2011 Incident

Pryor's attempts to cast doubt on the reasonableness of Corporate Security's investigation of the January 2011 Incident cannot overcome the undisputed facts that Reyes, Panos and Robinson-Palmer acted promptly when she complained, and that Robinson-Palmer properly interviewed Pryor and contacted Folan in Corporate Security. (JA 1121 – 1124, 1255 – 1264, 1322 – 1326 – 1335, 1361 – 1362, 1535 – 1536, 1542 – 1543, 1565 – 1567, 1602 – 1610, 1864 – 1866, 1881 - 1883.) Folan took all available information from Robinson-Palmer, including the fact that neither Pryor, nor anyone else, could identify any suspects who might leave this anonymous note. (JA 1484 – 1490, 1542 – 1545, 1565 – 1567, 1594, 1598 – 1601, 1865 – 1866, 1881 - 1883.) Folan determined he could not brush for prints given the length of time the document likely sat in Pryor's mailbox. (JA 1484 – 1490, 1542 – 1545, 1565 – 1567, 1594, 1598 – 1601, 1865 – 1866, 1881 – 1883.) Thus, Folan instructed Robinson-Palmer to address her supervisors, conduct periodic audits and to keep Folan informed. (JA 1352 – 1359, 1361 – 1362, 1864 – 1866, 1881 – 1883.) Robinson-Palmer did so and followed up with Folan on February 4

to report that there were no further developments. (JA 1326 – 1333, 1352 – 1359, 1361 – 1362, 1864 – 1866, 1881 – 1883.) The investigation and follow up instructions were plainly reasonable given the limited information available about the anonymous note and were calculated to end the alleged harassment. *Crockett v. Mission Hosp., Inc.,* 717 F.3d 348, 357-58 (4th Cir. 2013) (finding that the employer's undertaking of a prompt and thorough investigation was reasonably aimed to promptly correct the harassment, despite the fact that the human resources and management personnel had limited information to work with in investigating plaintiff's harassment claim). Indeed, no other similar incidents occurred for nine months.

Likewise the District Court correctly found that Zauner's investigation, on the heels of Folan's investigation, was immediate, timely, thorough and reasonably calculated to end the alleged harassment. *Olson v. Lowe's Home Ctrs. Inc*., 130 F. App'x 380, 392 (11th Cir. 2005) ("'an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint.'") Zauner's investigation was reasonable under the circumstances particularly in light of the fact that Pryor refused to cooperate. *See* JA 1505 – 1506, 1511 – 1513, 1516 – 1518, 1522 – 1523, 1533 – 1534, 1547 – 1548, 1593 – 1601; *Crockett*, 717 F.3d at 357-58 (despite the fact that the plaintiff refused to cooperate with the employer's investigation, the employer satisfied its burden in

proving its *Faragher/Ellerth* defense). Zauner was unable to identify a suspect but instructed supervisors to observe and report any similar activity, and to send an e-mail to all flight attendants alerting them to the incident, and to remind them of reporting procedures and the prohibitions against harassment. (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527, 1549 – 1551, 1598 – 1601, 1611 – 1619.) The District Court was correct in concluding that United cannot be liable simply because its investigative efforts failed to identify the responsible party. (JA 2267 – 2268 *citing Sunbelt Rentals*, 521 F.3d at 319 (holding that the applicable standard is whether the investigation was reasonably calculated to curtail similar offending conduct.)

In an attempt to overcome these undisputed facts and authorities, Pryor cites to *Alford v. Martin & Gass, In*c., *Spicer v. Commonwealth of VA Dept't of Corr*., and *EEOC v. Xerxes* as examples of what a "prompt and adequate response [to harassment] entails." (Plaintiff's Brief, p. 27.) However, none of these cases advance Pryor's theory and they do not begin to cast doubt on the District Court's well-reasoned holding that United's investigation and remedial actions were reasonable as a matter of law.

In *Alford v. Martin & Gass, In*c., the plaintiff alleged a racially hostile work environment and retaliation under Title VII. Unlike this case, the plaintiff in *Alford* claimed he was subjected to a series of racist incidents because two

supervisors made a number of racially derogatory statements directed at him. 391 Fed. Appx. 296, 298 (4th Cir. 2010). The plaintiff also alleged that three co-workers (who were identified by the plaintiff) perpetrated an incident in which plaintiff found a noose hanging from a piece of equipment in what the plaintiff interpreted to be a crudely-constructed effigy depicting a black man with a hangman's noose around his neck. *Id*. at 298-99. This Court affirmed the district court's summary judgment award to the employer on the grounds that the employer responded reasonably to the noose incident where the employer conducted interviews of the employees and issued reprimands where appropriate. *Id*. at 303-304.

In *Spicer v. Commonwealth of VA Dept't of Corr.*, the plaintiff prison guard alleged sexual harassment following a written memorandum that was issued by the prison warden which singled plaintiff out by name with respect to her allegedly revealing attire. 66 F. 3d 705, 707-08 (4th Cir. 1995). The district court agreed with the plaintiff and found that the employer failed to take effective remedial action. *Id*. at 710. On appeal, the Fourth Circuit reversed the district court's denial of summary judgment, finding that the employer took reasonable remedial steps to address the offending conduct such as ensuring the offending memorandum was not publicly posted, counseled those involved, and admonished those making inappropriate remarks. *Id*. at 710.

Unlike *Alford* and *Spicer*, Pryor's alleged harassment was limited to two events in 2011 in the form of an anonymous note, and was not conduct committed by specific, identified co-workers or managers. Despite the fact that Pryor did not identify any witnesses or suspects, United conducted a reasonable investigation and took appropriate remedial action in connection with the January 2011 incident by, among other things, contacting Corporate Security, conducting interviews of Pryor, supervisors, and managers, monitoring the mailboxes, and working with the local police. (JA 1121 – 1130, 1322, 1326 – 1335, 1361 – 1362, 1390 – 1391, 1495 – 1499, 1505 – 1510, 1518 – 1521, 1527 – 1528, 1535 – 1536, 1542 – 1543, 1547 – 1548, 1551 – 1552, 1565 – 1610, 1864 – 1866, 1881 – 1883.) Despite these efforts, neither United, nor MWAA, "a professional law enforcement agency armed with information that Plaintiff chose not to share with United," were able to identify any witnesses or suspects and closed their investigations. (JA 1174 – 1175, 1204 – 1205, 1484 – 1490, 1524 – 1527, 2668.)

The *Xerxes* decision cited by Pryor also does not support her appeal to reverse the district court. In *Xerxes*, employees complained that white co-workers made numerous racist comments to them, that unidentified co-workers left racist messages and drawings (including of a person hanging by a noose) in their work areas, and that Xerxes should have done more to stop the harassment. 639 F.3d 658, 662-66 (4th Cir. 2011). Although the employer was never able to determine

who left the racist drawings and messages, the court found that, for both the anonymous harassment and harassment committed by identified employees, the defendant had responded promptly and in a manner reasonably calculated to stop further activity in the workplace. 639 F.3d at 673. With reference to the anonymous messages, this Court noted that the defendant employer conducted internal investigations, reported the incidents to the local Sheriff's office, held a plant-wide meeting and advised employees that anyone with information was expected to come forward, among other remedial measures. 639 F.3d at 673. There, this Court emphasized that "the mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, *ipso facto*, allow a jury to conclude that an employer's response was not reasonably calculated to end the harassment." 639 F.3d at 669.

Just as in *Xerxes*, United conducted an internal investigation, worked with the local police department, disseminated a "must read" communication to all the Dulles-based employees informing them, among other things, that inappropriate and offensive material was found in a co-worker's mailbox, that United was in the process of investigating the incident and urging anyone with knowledge or information regarding the incident or similar activities to notify a member of management immediately, among other things. (JA 1165 – 1166, 1194 – 1195, 1549 – 1551, 1611 – 1619.)

32

**b.     The October 2011 Incident**

On appeal, Pryor elected to ignore United's investigation conducted into the October 2011 Incident by Bellomusto.  The District Court was undoubtedly correct in holding that the steps taken with respect to the investigation by Corporate Security's Folan and Miller, and Human Resources, Zauner and Bellomusto were sufficient as a matter of law.  The *Xerxes* court observed that, "[w]hen harassment reoccurred, Xerxes took increasingly progressive measures to address it."  639 F.3d at 675.  As a result, the court declined to impose liability on Xerxes and found that the company had fulfilled its legal obligations.  *Id*. at 676.  In the instant matter, not only did Bellomusto immediately investigate Pryor's complaint (and further investigated the January 2011 incident) in conjunction with Corporate Security personnel, he interviewed at least nine (9) witnesses.  (JA 1315 - 1316.) Bellomusto also coordinated a team and conducted periodic inspection of the mailboxes, and collaborated with local police to facilitate fingerprinting.  (JA 1151, 1279 – 1280, 1286 – 1297, 1302 – 1306, 1313 – 1317, 1374 – 1379, 1481.) More importantly, within two weeks of the October 2011 incident, United took increasingly progressive matters and installed surveillance cameras in the domicile. (JA 1285 – 1289, 1313 – 1317, 1348 – 1351, 1872 – 1874.)

Pryor's failure to address United's investigation into the October 2011 Incident is not surprising particularly because the result of the October 2011

Incident stopped the offending conduct and is thus fatal to Pryor's claim. *Mikels*, 183 F.3d at 330; *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3rd Cir. 1997). It is undisputed that ***no similar incidents occurred after October 2011***. This is critical here as this Circuit has "given great weight to the fact that a particular response was demonstrably adequate to cause cessation of the conduct in question." *Mikels*, 183 F.3d at 329 – 330 (district court's dismissal of plaintiff's hostile environment sexual harassment claims affirmed on the grounds that the remedial responses by the defendant were prompt and adequate where "perhaps most importantly" under Fourth Circuit precedent, the defendant caused the offending conduct to cease) ; *see also Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3rd Cir. 1997) ("a remedial action that effectively stops the harassment will be deemed adequate as a matter of law.")

Pryor also argues on appeal that the District Court erred in granting summary judgment to United because there is a "dispute of fact as to what exactly United's Policy was regarding complaints of harassment," and because United failed to follow its own procedures in connection with its investigation of the January 2011 Incident. (Plaintiff's Brief, pp. 31 - 34.) In support of her argument, Pryor cites *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) for the proposition that an anti-harassment policy will not suffice to show the requisite level of care where an employer has failed to enforce the policy. (Plaintiff's Brief,

p. 31.)  Notably, *Spriggs* does not state that a failure to follow the investigation procedure defeats the *Faragher/Ellerth* defense.

The District Court was correct in finding that the law does not mandate the specific actions to take in response to anonymous harassment.  *See* JA 2268 - 2269; *Central Wholesalers, Inc.*, 573 F.3d at 178 (holding that there is no "exhaustive list" or "particular combination" of remedial measures or steps that an employer need employ to insulate itself from liability); *see also Silver v. GMC*, 2000 U.S. App. LEXIS 17752 (4th Cir. 2000) (explaining that "the law requires reasonableness, not perfection in developing, implementing, and enforcing sexual harassment policies and procedures.").  Indeed, United is not a law enforcement agency, and the District Court was thoughtful in highlighting that even MWAA, a professional law enforcement agency armed with information that Pryor chose not to share with United, was unable to track down the party responsible for the January 2011 incident.  *See* JA 2268.

Moreover, despite Pryor's attempts to distort the record, it is undisputed (particularly where, as here, alleged anonymous threats were involved) that one appropriate path for the escalation and investigation of both the January and October 2011 incidents was to contact United's Corporate Security.  (JA 1542 –

1543.)[4]     Zauner, United's F.R.C.P. 30(b)(6) corporate designee on the issue of

United's corporate policies, unambiguously testified that the policies in effect at

the time Pryor received the January 2011 document in her mailbox permitted

management to contact Corporate Security, and that United management properly

escalated Pryor's complaint when they were first notified, particularly given the

nature of the document found.   (JA 1542 – 1543.)   Thus, the fact that local

management immediately contacted Corporate Security, rather than the ESC, does

not begin to cast doubt on the reasonableness of United's actions in response to

Pryor's report of the January 2011 anonymous note.  *Baldwin*, 480 F.3d at 1304.

There is simply nothing in the Record to suggest that United acted unreasonably.

The District Court's holding that liability for any alleged harassment could not be

imputed to United should therefore be affirmed. *See* JA 2267 – 2270; *see also*

*EEOC v. Xerxes*, 639 F.3d 658, 669 (4th Cir. 2011).

### 2.     Pryor Mischaracterizes the Facts Regarding United's Response To The January 2011 Incident

On appeal, Pryor limits her challenge to United's response and remedial

---

[4]  Pryor's suggestion that the District Court's finding that involving Corporate Security was an acceptable alternative to calling the ESC was in error and unsupported by the record should be rejected out of hand. Even if the District Court relied on an inaccurate citation to the record, it is of no moment.  "The rule is settled that if the decision below is correct, it must be affirmed, [even if] the lower court relied upon a wrong ground or gave a wrong reason." *United States v. Carter*, 139 F.3d 424 (4th Cir. 1998) (*citing Helvering v. Gowran*, 302 U.S. 238 (1937); *Covenant Media*, 493 F.3d at 430-31) (same). Thus, Pryor's critique of the District Court's reasoning is inapposite.  Moreover, given the extensive inaccurate record citations in Pryor's brief, the irony of Pryor's criticism should not be lost on this Court.

measures to the January 2011 note, thereby conceding the sufficiency of United's response and remedial measures in October 2011. (Plaintiff's Brief, p. 26 – 29.).

In her challenge, Pryor unfortunately makes a number of gross misstatements of the factual record in her attempt to discredit the District Court's holding. For example, Pryor claims that United did not act promptly, and "took no action" other than to make "one" phone call to Corporate Security and have Robinson-Palmer meet with other supervisors.[5] However, the undisputed record reflects that Pryor received the first note on January 8, 2011, a Saturday when neither Panos nor Robinson-Palmer were present in the office. (JA 1255 – 1257, 1331 – 1332, 1604.) On Monday, January 10, 2011 (the next business day), Panos attempted to contact Pryor, but could not reach her. (JA 1262.) On January 11, 2011 Robinson-Palmer contacted Folan in United's Corporate Security to inform him of the January 8 Incident. (JA 1334, 1361 – 1362, 1542 – 1543, 1565 – 1567, 1864 – 1866, 1881 – 1883.) Thus, Pryor's claim that United "waited days" before contacting Corporate Security is misleading and does not support the claim that United substantially delayed responding to her complaint.[6]

---

[5] The record that Pryor cites, JA2055, is incomplete and is only limited to Robinson-Palmer's deposition testimony wherein she describes to Folan the specific briefing she had with her supervisors. (Plaintiff's Brief, p. 27.)

[6] Pryor cites to JA2041 – 2042 to support this argument. (Plaintiff's Brief, p. 28.) However, the citation is to Robinson-Palmer's deposition testimony wherein she recounts the substance of her conversation with Folan. In that portion of her transcript, there is no mention of the timing of the conversation.

In reality, upon learning of the note in January 2011, Robinson-Palmer and Panos took the threat seriously and promptly began to investigate and contacted Corporate Security. (JA 1334, 1361 – 1362, 1542 – 1543, 1565 – 1567, 1864 – 1866, 1881 – 1883.) In order to obtain background on the incident, Robinson-Palmer conducted the initial interview of Pryor. (JA 1322, 1326 – 1333.) Robinson-Palmer also monitored the flight attendant's mailboxes for suspicious activity. (JA 1864 – 1866 .) Robinson-Palmer also spoke with Folan who himself was unable to identify a suspect, time of placement of the document or brush for prints.[7] (JA 1484 – 1490, 1542 – 1545, 1565 – 1567, 1594, 1598 – 1601, 1864 – 1866, 1881 – 1883.) Folan instructed Robinson-Palmer to address her supervisors to make them aware of the incident; have periodic audits of Pryor's mailbox and to keep him informed. (JA 1352 – 1359, 1361 – 1362, 1864 – 1866, 1881 – 1883.) Robinson-Palmer took those actions. (*Id*.)

Pryor's assertion that United failed to interview anyone other than Pryor is also a gross misstatement of the record.[8] It is true that Robinson-Palmer

---

[7] Pryor's claim that Folan's report is inadmissible hearsay is unsupported in fact and law. Folan's report is a record of the actions Folan took at or near the time Pryor complained about the January 2011 incident, and was kept by United in the course of a regularly conducted business activity and therefore constitutes a business record, which is an exception to the hearsay rule. *See* JA 1454 -1457, 1475 – 1477; *see also* F.R.E. 803(6).

[8] Pryor cites to JA1974 – 1978 for this contention. (Plaintiff's Brief, p. 28.) The record to which Pryor cites is Panos' deposition testimony pertaining to the discussion she had with Robinson-Palmer regarding the prostitution rumors, and therefore does not support Pryor's

interviewed Pryor, as did Zauner.  (JA 1121 – 1124, 1322, 1326 – 1335, 1125 –

1130, 1390 – 1391, 1505 - `506, 1593 – 1601.)  Zauner, however, also interviewed

Folan, Robinson-Palmer, Reyes, Barretto, in connection with her investigation. (JA

1390 – 1391, 1497 – 1499, 1505 – 1510, 1518 – 1521, 1527 – 1528, 1535 – 1536,

1547 – 1548, 1551 – 1552, 1589 – 1610.)

Pryor's assertion that United's Corporate Security closed its investigation

without notifying her is likewise inaccurate.  While Pryor was not notified at the

time that Corporate Security formally closed the investigation on February 4, 2011,

Pryor's claim that there were repeated promises of an investigation and no

indication that any investigation was taking place is belied by her admissions that

she knew Corporate Security had been contacted, and the fact that Zauner informed

Pryor of her investigation.  (JA 1174 – 1175, 1204 – 1205.)   In any event, it is

immaterial as to whether United's actions were reasonably calculated to stop the

offending conduct.  In short, Pryor's misstatements do not create an issue of

genuine material fact as to whether United's investigation was reasonably

---

argument.  Pryor also misstates the record include her assertion that Robinson-Palmer "alleged
that she also conducted an independent investigation into the rumors."  (Plaintiff's Brief, p. 7.)
The record to which Pryor cites to support this actually reflects Robinson-Palmer's deposition
testimony regarding a conversation she had with a flight attendant pertaining to the prostitution
rumors and in which the flight attendant could not provide any details about who was involved.
(JA2027 – JA2031.)    Additionally, Pryor erroneously identified Robinson-Palmer as the
individual who conducted the investigation into the prostitution rumors.  (Plaintiff's Brief, p. 30.)
The record makes clear that it was Panos, not Robinson-Palmer, who investigated the rumors.
(JA 1418 – 1426, 1366 – 1367.)

calculated to stop the anonymous threatening racial notes as a matter of law. *Anderson*, 477 U.S. at 252 (the moving party must come forward with evidence on which the jury could reasonably find for the plaintiff).

### 3. Pryor's "Notice of Generalized Harassment" Arguments Should Be Deemed Waived

Pryor claims, for the first time on appeal, that United was "on notice of generalized harassment." Specifically, Pryor claims that the prostitution rumors and Fall 2010 bulletin board posting somehow contributed to the January 2011 Incident. (Plaintiff's Brief, p. 29 – 31, 34 – 35.)[9] Pryor also goes on to claim for the first time on appeal that United's alleged failure to properly investigate both the bulletin board postings in 2010, and January 2011, Incident somehow resulted in the October 2011 incident. (Plaintiff's Brief, p. 34 – 36.) Pryor's belated arguments should not be considered as she failed to raise these argument at the District Court. *Wheatley v. Wicomico Cnty., Maryland*, 390 F.3d 328, 334-35 (4th Cir. 2004) (quoting *Williams v. Prof. Transp. Inc.*, 294 F.3d 607, 614 (4th Cir.2002)) ("[i]ssues raised for the first time on appeal 'are generally not considered absent exceptional circumstances.'"); *see also Singleton v. Wulff*, 428 U.S. 106, 120, 96 S. Ct. 2868, 49 L.Ed.2d 826 (1976).

---

[9] Pryor claimed in her summary judgment papers and at oral argument that United failed to investigate the prostitution ring rumors, and that the bulletin board posting and January 2011 note were each instances of a hostile work environment that United failed to investigate. (JA 1918 – 1919, 1927 – 1937, 2234 – 2235.)

40

### 4.     The Incidents Were Isolated And Were Not Sufficient To Place United On Notice Of Generalized Harassment

Even if Pryor's argument is considered by this Court, it does not support reversal of the District Court's opinion.  At the outset, there is no genuine issue of material fact as to whether United maintained and disseminated (via Skynet, postings in the base, and by Sales placing the policies into the flight attendants' mailboxes), a policy against discrimination and harassment that contained multiple avenues to complain.  (Plaintiff's Brief, p. 5 – 6 ; JA  1220 – 1222, 1385 – 1388, 1368 – 1374, 1281 – 1282, 1239 – 1240, 1243, 1324 – 1325, 1529 – 1531, 1539 – 1541, 1627, 1638 – 1639, 1657, 1723, 1744 – 1746.)  Nevertheless, Pryor claims that "the harassment [in the Dulles domicile] had continued unabated," in an attempt to create the false impression that the work environment for the roughly 2,500 United flight attendants assigned to the Dulles airport was permeated with incidents of racial harassment.  (Plaintiff's Brief, pp. 24 – 26, 29 – 31, 35.)

However, the undisputed record reflects that, at most, between 2009 and the end of October 2011, there were *four* incidents where documents containing racial slurs were discovered in the Dulles domicile.  Those four incidents involved only 10 of the more than 2,500 flight attendants employed by United over a more than two year period.  (JA 0015 – 0016, 1110 – 1120, 1134 – 1179, 1183 – 1184, 1193, 1196 – 1216, 1283 – 1284, 1306 – 1310, 1313 – 1317.)  Thus, the record confirms that in context, the incidents about which Pryor complains were isolated.

41

### a.     The Prostitution Rumors

There are no facts in the record to support Pryor's speculation that the prostitution rumors had any connection to the subsequent bulletin board postings or notes Pryor received in her mailbox in 2011.  *Othentec,* 526 F.3d at 140, *supra.* Accordingly, United was not "on notice" of any generalized harassment in Dulles as result of the prostitution rumors.

Moreover, Panos' 2009 investigation was sufficient in light of the fact that no one, not even Pryor, complained or otherwise identified any individual, or further details, regarding the prostitution rumors.  (JA 1418 – 1426, 1231 – 1238, 1366 – 1367.)  Nevertheless, Panos on her own initiative after catching wind of the general rumors attempted to investigate them but could not substantiate them.  *Id*.; *Central Wholesalers, Inc*., 573 F.3d at 178; *see also Johnson et al. v. United Airlines,* 2013 U.S. Dist. LEXIS 110640, *13 - 14 (E.D. Va. August 2, 2013), *appeal dismissed*.

### b.     The 2010 Bulletin Board Postings and January & October 2011 Incidents

With regard to the bulletin board postings, which were not identified in Pryor's Amended Complaint, it is undisputed that Robinson–Palmer, who is African American, investigated both anonymous bulletin board postings, which occurred in a short period of time in the fall of 2010.  (JA 1298 – 1301, 1427 – 1446, 1247 – 1254, 1336 – 1342, 1346 – 1347, 1470 – 1471.)  Robinson-Palmer

immediately called the number listed on the document and spoke with a woman from the apartment complex listed. (*Id.*)  She confirmed that her company did not create the ad.  (*Id.*)  Robinson-Palmer immediately destroyed the ad and monitored the bulletin board for any other offensive postings. (*Id.*)

As the District Court correctly held Robinson-Palmer's actions were sufficient to keep the fliers from reappearing.  (JA 2267.)  Pryor's argument that Robinson-Palmer somehow failed to properly investigate because she destroyed the posting attempts to distract this Court from the ultimate, undisputed dispositive fact that ***there were no further bulletin board postings after Robinson-Palmer's actions in fall 2010***.  (JA 1427 – 1431; *Johnson*, 2013 U.S. Dist. LEXIS 110640 at **13-14.

There is no evidence to suggest that the bulletin board postings in 2010 had any connection to the 2011 notes Pryor received in her company mailbox. Moreover, the cases to which Pryor cites to support her contention that United knew or should have known about generalized harassment and that somehow it should have acted differently in response to the bulletin board postings and to the January 2011 mailbox note are unavailing.  (Plaintiff's Brief, p. 24 – 25.)  For example, in *Freeman v. Dal-Tile Corp.*, this Court reversed the Eastern District of North Carolina's granting of summary judgment to the defendant employer on the plaintiff's hostile work environment claim finding that the defendant employer

43

knew or should have known of racial (and sexual) harassment perpetrated by the plaintiff's co-worker over the course of a three-year period. 750 F.3d 413, 416 – 419 (4th Cir. 2014). In *Freeman*, however, unlike the instant matter, not only was the harasser identified, but this Court noted that: (a) the harasser *admitted* to making racially inappropriate comments; (b) other co-workers complained about the harasser; and (c) the plaintiff's direct supervisor was present when some of the harassing comments were made. *Id*. Accordingly, *Freeman* is distinguishable on its face and does not cast doubt on the District Court's decision here.

The situations in the instant matter are distinguishable for additional reasons. First, the bulletin board postings, which Pryor never saw, were isolated incidents in 2010 and promptly investigated. The District Court properly noted that: (1) Pryor's argument regarding the bulletin board postings "has minimal legal relevance" since it is undisputed that Pryor never saw the fliers; and (2) Robinson-Palmer took remedial action by removing the posts and continually monitoring the bulletin board. Following Robinson-Palmer's removal of the posts, ***no other racially charged notes appeared in the employee lounge***. (JA 1427 – 1431.) Thus, United's action, which caused the cessation of the offending conduct, precludes it from liability. *Mikels*, 183 F.3d at 330, *supra*.

Likewise, Pryor's claim that that United's alleged failure to properly investigate the January 2011 Incident somehow resulted in the October 2011

incident should be rejected for.  (Plaintiff's Brief, p. 34 – 36).   As detailed above, the January 2011 incident was also isolated and promptly investigated.   The District Court was correct in holding that United's response to the January 2011 incident was "diligent" and that United cannot be held liable simply because its investigative efforts failed to identify the responsible party.  *See* JA 2268 *citing Sunbelt Rentals*, 521 F.3d at 319.

The facts in the remainder of cases cited by Pryor are also easily distinguishable from the instant matter.  Each of the cases involved circumstances in which the harasser was identified and the courts of appeal found that there was a genuine issue of fact as to whether the defendant employers' responses to the complaints were adequate.[10]

Additionally, unlike the cases cited by Pryor, United immediately responded to, investigated each incident of anonymous harassment, and caused the offending

---

[10] *See Amirmokri v. Baltimore Gas and Electric Co*., 60 F.3d 1126, 1128-29 (4th Cir. 1995) (plaintiff alleged his supervisor made numerous harassing comments over a number of months about which he complained to his department manager, but the evidence as to whether the department manager actually performed an investigation was inconsistent); *Dunn v. Washington County*, 429 F.3d 689, 690 (7th Cir. 2005) (plaintiff identified her harasser  as a doctor with staff privileges and provided evidence that the defendant hospital knew the harasser "made life miserable for women but not men" but did nothing in response); *Watson v. Blue Circle, Inc*., 324 F.3d 1252, 1255 (11th Cir. 2003) (plaintiff identified co-workers and customers as alleged harassers who made unwelcome sexual comments and physical touching but the court found a genuine issue of material fact as to whether the employer had actual notice of the incidents at issue where the supervisor was overheard to have said he did not want to "mess with" the harasser's conduct toward the plaintiff); *but c.f. Mikels v. City of Durham*, 183 F.3d 323, 326 (4th Cir. 1998) (defendant's prompt and adequate investigation of plaintiff's complaints that her co-worker grabbed and kissed her on the mouth, coupled with remedial action that caused the offending conduct to cease, was fatal to plaintiff's Title VII claim).

45

conduct to cease. *See* §§II(D)(2) – (4), *supra*. Thus, Pryor's suggestion that the prostitution rumors, bulletin board postings, January and/or October 2011 incidents somehow put United on notice of generalized "racial hostility at the Dulles domicile" is without merit and insufficient to find United on notice of any harassment. (Plaintiff's Brief, pp. 30 - 31.)

For these reasons, Pryor's theory fails and the District Court's finding that United exercised prompt remedial action should be affirmed.

### 5.  Pryor's Attempts To Second-Guesses United's Business Judgment Should Be Disregarded

The crux of Pryor's remaining arguments on appeal point to alleged deficiencies in United's investigation as to its handling of evidence and witness interviews.[11]   As the District Court correctly held, an employer cannot be held liable for its supervisory employees who do not follow internal policies and procedures to a "T." (JA 2268.)  The law simply does not dictate a particular set of measures an employer must take in response to a complaint. *Central Wholesalers, Inc.* 573 F.3d at 178.  Most significantly, as the District Court noted, there is no

---

[11] Pryor incredibly claims that United made no attempt to preserve evidence related to the note Pryor received and/or lost the document Pryor received.  (Plaintiff's Brief, pp. 27 – 28.)  While there is differing testimony as to who retained the actual original of the January 2011 (as opposed to copies, which are repeatedly found in the record) and whether the original document included a handwritten drawing, there is nothing in the record to suggest that United lost or destroyed any evidence. Moreover, as the District Court properly held, that differing testimony is immaterial because for purposes of summary judgment, both United and the District Court accepted Pryor's version of what the note looked like as true for purposes of the motion. (JA 2246.)

evidence that if United had contacted the ESC the culprit would have been found. (JA 2269.)

Pryor's arguments are nothing more than an improper attempt to second-guess United's good faith business judgment and should be rejected. *See* Plaintiff's Brief, pp. 26 – 29; *Baldwin v. Blue Cross/Blue Shield*, 480 F.3d 1287, 1304 (11th Cir. 2007) (affirming summary judgment for the employer and finding that in connection with the *Faragher/Ellerth* defense, second guessing company investigations on the grounds that the plaintiff contests the reasonableness of an investigation would improperly put courts in the business of supervising internal investigations). As detailed below, this second-guessing is not sufficient to overcome the fact that United's investigation and following remedial actions were reasonably calculated to end the alleged harassment. For these reasons, the District Court properly found United's investigation was prompt and adequate and its award of summary judgment to United on this issue should be affirmed.

## V.    CONCLUSION

For the foregoing reasons, United respectfully requests that the judgment of the District Court in favor of United be affirmed.

Respectfully submitted,


*/s/ Paul E. Bateman*
Paul E. Bateman
Jody A. Boquist
Angela I. Rochester
LITTLER MENDELSON, P.C.
312 North Clark Street, Suite 1000
Chicago, IL 60654
312.372.5520
pbateman@littler.com
jboquist@littler.com
arochester@littler.com

*Counsel for Appellee United Airlines, Inc.*

Dated:  August 25, 2014

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Federal Rule of Appellate Procedure 34(a) and Fourth Circuit Local Rule 34(a), Appellant United Airlines, Inc. ("United") states that it is willing to appear for oral argument should the Court deem it necessary to its full consideration of the issues raised in this appeal.

*/s/ Paul E. Bateman*

Paul E. Bateman
Jody A. Boquist
Angela I. Rochester
LITTLER MENDELSON, P.C.
312 North Clark Street
Suite 1000
Chicago, IL 60654
312.372.5520
pbateman@littler.com
jboquist@littler.com
arochester@littler.com

*Counsel for Appellee United Airlines, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,620 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman font.

*/s/ Paul E. Bateman*
Paul E. Bateman
Jody A. Boquist
Angela I. Rochester
LITTLER MENDELSON, P.C.
312 North Clark Street
Suite 1000
Chicago, IL 60654
312.372.5520
pbateman@littler.com
jboquist@littler.com
arochester@littler.com

*Counsel for Appellee United Airlines, Inc.*

47

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of August, 2014, a copy of the foregoing ***Appellee's Brief*** was filed using the United States Court of Appeals for the Fourth Circuit's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel for Appellant:

Dow W. Patten
Spencer F. Smith
SMITH PATTEN
353 Sacramento Street, Suite 1120
San Francisco, CA 94111
dow@smithpatten.com

Joshua Erlich
The Erlich Law Office, PLLC
2111 Wilson Blvd., Ste. 700
Arlington, VA 22201
erlich@erlichlawoffice.com

/s/Angela I. Rochester
Angela I. Rochester

Firmwide:127521959.5 052664.1098
DRAFT 8/19/14

48